# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 11 C 50222 | DATE | 4/2/2013 |
| CASE TITLE | Holliman v. McDermott | | |

**DOCKET ENTRY TEXT:**

This case was tried before the court on February 27, 2013. For the reasons stated below, the court finds for defendants and against plaintiff. This case is closed.

■[ For further details see text below.]

Docketing to mail notices.

---

Plaintiff, Anthony J. Holliman, brought suit against defendants, Winnebago County Correctional Officer Joseph McDermott and Winnebago County,[1] alleging excessive force pursuant to 42 U.S.C. § 1983 and Illinois state-law battery. In addition to the testimony, video footage, and exhibits presented at the bench trial, the court has reviewed the parties' proposed findings of fact and conclusions of law which were submitted after the trial. The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

Plaintiff testified that he is on disability for blindness, a life-long problem that has gotten worse in the last 12-18 months. However, plaintiff said that he was able to see and navigate his surroundings on June 1, 2011. On that evening he was outside of his house when a friend asked plaintiff to hold his beer while he zipped up his coat. Just then, a police officer pulled up and observed plaintiff holding the beer. Plaintiff explained that the officer ultimately took him to jail because there was an outstanding civil bench warrant for his arrest issued by the family court in connection with a child support issue.

At the jail, McDermott came into the transfer cell where plaintiff was being held, told plaintiff to turn around and place his hands on the wall, and plaintiff complied. McDermott patted him down all the way to his feet and plaintiff, assuming McDermott was finished, turned around. McDermott said, "I'm not done yet. Turn back around. Put your hands on the wall." Plaintiff complied, McDermott patted him down again, and plaintiff turned around again. McDermott again said, "turn back around because I'm not done." When plaintiff turned back around, his shorts fell off, plaintiff picked them up and handed them to McDermott saying, "take them and shake them." Plaintiff said that he was agitated and that McDermott appeared agitated. McDermott handcuffed plaintiff behind his back and walked him toward a holding cell. McDermott twisted plaintiff's wrist with the cuffs and plaintiff said, "you don't have to be so aggressive like that." Plaintiff testified that it was very painful.

According to plaintiff, as they walked into the holding cell, McDermott had him by the handcuffs and left shoulder and "just like slung me into the wall because, you know, I'm going into the wall. I just turned my head, you know, and broke my glasses and stuff." Plaintiff clarified that he did not trip over the bench in the holding

cell but, rather, McDermott shoved him into the wall hard enough to break his glasses. At that point, plaintiff said, "oh, yeah. Bust my shit now, huh. You bust my shit, you know. You bust my shit." Plaintiff was bleeding and after a nurse attended to him, officers took him to dress-out. On the way, plaintiff asked that his picture be taken to document his injury. Plaintiff admitted that he did not know there was a video camera in the holding cell.

The officers brought plaintiff to the second floor by way of an elevator. When plaintiff's attorney asked him about the allegation that he hit his head on the elevator wall, plaintiff denied doing so and claimed that he merely bent over to look at his reflection in the shiny metal wall in order to assess his injury.

Plaintiff testified further that it cost him $18 for a new pair of glasses, and his cut healed but left a scar in the corner of his eye that is not readily visible. Plaintiff said that it was very painful when his head hit the wall and the incident caused him to have headaches while he was incarcerated, and for a month or two after he was released from jail. Plaintiff also said that his wrists were swollen from the handcuffs and he had scars "for like about eight days." Plaintiff testified that the incident made plaintiff sad due to the manner in which he was treated and the feeling that McDermott would get away with his conduct.

On cross-examination, plaintiff agreed that he received Tylenol the day after the incident and that he sought no other medical care during the 30-day period he remained incarcerated at the jail. Plaintiff also agreed that the warrant for his arrest was followed a finding of contempt and the imposition of a 60-day sentence for which he ultimately received day-for-day credit. Plaintiff denied being intoxicated on the night in question and said that he had just one beer earlier that day.

McDermott testified that on Saturday night, June 1, 2011, he was on duty when plaintiff was brought to the Winnebago County Jail. As McDermott was patting plaintiff down in the transfer cell, plaintiff turned around and faced him. McDermott instructed plaintiff to put his hands back on the wall and plaintiff complied. McDermott attempted to finish patting plaintiff down but plaintiff quickly turned around again. McDermott told plaintiff that he was not done and that plaintiff needed to place his hands back on the wall. Plaintiff complied. Plaintiff turned around a third time and started yelling and swearing at McDermott and kind of throwing his arms up. Plaintiff threw his socks and shorts on the floor and refused to pick them up. At that point, Sergeant Kobler entered the transfer cell and McDermott instructed plaintiff to place his hands behind his back so that he could be handcuffed. McDermott explained that he handcuffed plaintiff because plaintiff was intoxicated, uncooperative, and unpredictable and would be placed in a holding cell until he was ready to cooperate. When asked why he believed plaintiff was intoxicated, McDermott said the smell of alcohol on his breath was strong, his eyes were glossy and bloodshot, and he was acting irrationally. As they reached the holding cell, McDermott intended to walk plaintiff up to the bench attached to the wall, place plaintiff's knees on the bench, and position plaintiff's body against the wall in order to safely remove the handcuffs. McDermott explained that it was common practice to proceed in this manner when removing an inmate's handcuffs. When asked what happened when he escorted plaintiff into the holding cell, McDermott said:

> We walked up to the bench. Mr. Holliman went forward. No effort on my part. His head did make contact with the wall. I was surprised when it happened. He went forward. I believe he just walked into the bench because he went forward, and it surprised me. He didn't stop.

McDermott said that the incident happened very quickly and he did not push plaintiff into the wall or intend to injure plaintiff. McDermott also denied intentionally twisting plaintiff's handcuffs in order to cause him pain.

On cross-examination, McDermott acknowledged that in the report he prepared within an hour of the incident he wrote: "As we secured him to the wall, [plaintiff] jerked his head towards the wall causing his glasses to break." McDermott said that is how he perceived it at the time but after viewing the video tape he saw that plaintiff tripped when his knees hit the bench. McDermott said that at the time of the incident he knew there was a camera in the holding cell and he reviewed the video later that night after he prepared his report.

Corrections Officer Sean Powers testified that on the night in question he heard a large amount of commotion and yelling coming from the transfer cell. When he got to the transfer cell, he determined that it was plaintiff who was yelling. Powers observed McDermott place handcuffs on plaintiff and escort him to a holding cell. When Powers entered the holding cell McDermott had plaintiff secured against the wall with his knees on the stoop used for seating. Powers assisted McDermott by placing his hand on plaintiff's shoulder/tricep area. Plaintiff was struggling as McDermott was trying to remove the handcuffs so plaintiff was placed on the floor to remove his handcuffs. Powers did not observe an injury but saw blood. After plaintiff was treated for his injury, he was escorted to the second floor. When plaintiff, Powers, and some other officers entered the elevator, plaintiff dropped his head and hit it against the wall near his hair line. Powers pulled plaintiff away from the wall. On cross-examination, Powers acknowledged that in his report prepared the same night he wrote that "Officer P. Hawks and myself escorted [plaintiff] to the elevator, where he began banging his face onto the elevator wall."

At the close of the evidentiary hearing, the court admitted the pertinent video footage from the jail on the night in question. The court also admitted the deposition testimony of Sergeant Kobler by agreement of the parties. According to his deposition testimony, Kobler heard commotion and yelling from a transfer cell on the night in question and when he went to the cell he found plaintiff upset and refusing McDermott's commands that he put his clothes back on. Based on plaintiff's behavior, Kobler believed that plaintiff was intoxicated. Plaintiff did not physically resist but refused to put his hands behind his back. Kobler and McDermott had to place plaintiff's hands behind his back in order to handcuff him. Kobler followed as McDermott escorted plaintiff to a holding cell. Plaintiff did not resist on the way to the holding cell. When Kobler entered the holding cell, he saw plaintiff up against the wall, Powers and McDermott behind him, and plaintiff's glasses on the bench or on the floor. Kobler testified that on the night of the incident, McDermott told him that plaintiff lunged into the wall himself, breaking his glasses, and that he did not push plaintiff into the wall.

## II. CONCLUSIONS OF LAW

At the time of the excessive force alleged in this case, as a sentenced inmate, plaintiff was protected by the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment which is defined as the unnecessary and wanton infliction of pain. Forrest v. Prine, 620 F.3d 739, 744 (7th Cir. 2010). Thus, in order to sustain his § 1983 excessive force claim, plaintiff has the burden of demonstrating by a preponderance of the evidence that (1) McDermott used force on plaintiff; (2) McDermott intentionally used extreme or excessive cruelty toward plaintiff for the purpose of harming him, and not in a good faith effort to maintain or restore security or discipline; (3) McDermott's conduct caused harm to plaintiff; and (4) McDermott acted under color of law. See Seventh Circuit Pattern Civil Jury Instruction 7.15. Elements one and four are not in dispute because McDermott, as a Winnebago County Corrections officer, was acting under color of law and used some amount of force in escorting plaintiff into the holding cell. Therefore, the court is tasked with determining whether plaintiff has proven elements two and three by a preponderane of the evidence. For the reasons that follow, the court concludes that plaintiff has failed to sustain his burden of showing that his injury was the result of McDermott pushing him into the wall with the intent to injure him.

The parties each argue that the video tape of the incident resolves this case in their favor. Plaintiff maintains that "[i]t shows defendant McDermott guiding a handcuffed and helpless [plaintiff] into the holding cell, increasing speed, and then extending his arms to shove [plaintiff's] face into the wall." In contrast, McDermott maintains that the video shows that he did not recoil and then extend his arms as would have been necessary to forcefully throw or sling someone. The court has carefully reviewed the video and finds it to be inconclusive. The video does not, however, preclude the possibility that plaintiff intentionally hit his own head on the wall in the holding cell or that he tripped and accidently fell into the wall and finds that there is substantial evidence which supports that conclusion.

First, McDermott immediately reported that he did not push plaintiff but, rather, that plaintiff lunged into the wall on his own. That McDermott later changed his mind and decided that plaintiff tripped after he viewed

the video does not detract from the fact that McDermott has consistently denied pushing plaintiff into the wall. The court credits McDermott's trial testimony that he did not push plaintiff into the wall or intend to injure plaintiff. Moreover, the court finds it unlikely that McDermott would intentionally injure an inmate in full view of a security camera which he knew to be present. In contrast, plaintiff agreed that he did not know about the camera in the holding cell on the night in question. Therefore plaintiff did not have the same disincentive to engage in nefarious conduct.

Second, plaintiff's injury was minor. Plaintiff sustained a small laceration and broken glasses. Other than the nurse's immediate response and Tylenol on the day following the incident, plaintiff neither received nor sought medical treatment for his injury while incarcerated at the jail for a total of 30 days.[2] Therefore, plaintiff's injury was consistent with an accidental or self-inflicted injury, not with intentionally inflicted harm.

Third, the court credits the testimony of McDermott, Powers, and Kobler that plaintiff was uncooperative and intoxicated on the night in question, and plaintiff readily admitted that he was agitated. His intoxicated, uncooperative, and agitated state, coupled with life-long vision problems makes it significantly more likely that plaintiff deliberately lunged into the wall causing his own injury or failed to see the bench and tripped.

Fourth, and most convincingly, very soon after the incident in the holding cell, plaintiff either hurt or attempted to hurt himself again by hitting his head on the elevator wall at a time when it is clear that no officer was pushing him.[3] Plaintiff's attempt to explain his behavior away by claiming that he was trying to look at his injury in his reflection on the shiny metal elevator wall is not convincing because it is contradicted by the video. At the point where plaintiff either hits or attempts to hit his head against the elevator wall, the video shows plaintiff drop his head such that his eyes were oriented toward the elevator floor and not toward the wall. For these reasons, the court concludes that plaintiff has failed to prove by a preponderance of the evidence the second and third elements of his § 1983 excessive force claim because he has not shown that McDermott intentionally used excessive cruelty toward plaintiff for the purpose of harming him, or that McDermott's conduct caused his injury.

The court further concludes that the foregoing reasoning regarding plaintiff's § 1983 excessive force claim applies with equal force to plaintiff's battery claim. Plaintiff's failure to sustain the causation and intent elements of his excessive force claim also negates his state-law battery claim. See Bakes v. St. Alexius Med. Ctr., 2011 IL App (1st) 101646, ¶ 22 ("[B]attery is committed by an individual if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.'") (quoting Restatement (Second) of Torts § 13 (1965)). Thus, the court finds that plaintiff has also failed to prove his state-law battery claim by a preponderance of the evidence.

### III. CONCLUSION

For all the reasons stated, judgment is entered in favor of defendants and against plaintiff. This case is closed.

---

1. Winnebago County is named only as an indemnor of McDermott for the torts he allegedly committed during the scope of his employment. See 745 ILCS 10/9-102.

2. The court notes that plaintiff has not shown what treatment the nurse provided him or that he required even a single stitch.

3. Plaintiff's head travels partially out of the frame so that the video does not show whether his head actually makes contact with the elevator wall.